# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| SCOTT WILLIAM FAUL, | Case No. 22-CV-2993 (MJD/JFD) |
| Petitioner, | |
| v. | **ORDER and REPORT AND RECOMMENDATION** |
| MICHAEL LEJEUNE, Warden, | |
| Respondent. | |

| | |
|---|---|
| SCOTT WILLIAM FAUL, | Case No. 23-CV-1337 (MJD/JFD) |
| Petitioner, | |
| v. | |
| MARK W. KING, Warden, | |
| Respondent. | |

This matter is before the Court on Petitioner Scott William Faul's petitions for writs of habeas corpus, in which he argues he is being held in violation of the Constitution and the laws of the United States and should be immediately released. (Dkt. No. 1 in 22-CV-2993 (MJD/JFD); Dkt. No. 1 in 23-CV-1337 (MJD/JFD).) In his first petition, Mr. Faul claims that his release date has been calculated incorrectly under 18 U.S.C. § 4206(d). (Pet. 8, Dkt. No. 1 in 22-CV-2993 (MJD/JFD).) In his second petition, Mr. Faul challenges the United States Parole Commission's ("the Commission") denial of his parole, claiming that the decision lacked a rational basis, infringed on his First Amendment rights, and was based on an unconstitutionally vague statute, 18 U.S.C. § 4206(d). (Pet. 6, Dkt. No. 1 in 23-CV-

1337 (MJD/JFD).) Mr. Faul also requests appointment of counsel (Dkt. No. 21 in 23-CV-1337 (MJD/JFD)) and a temporary restraining order prohibiting his transfer from FCI Sandstone (Dkt. No. 17 in 22-CV-2993 (MJD/JFD); Dkt. No. 19 in 23-CV-1337 (MJD/JFD)). For the reasons that follow, the Court recommends that the petitions and the motion for a temporary restraining order be denied and denies the motion to appoint counsel as moot.

## I.  FACTUAL BACKGROUND

Mr. Faul participated in a 1983 shootout in Medina, North Dakota in which Deputy U.S. Marshals Kenneth Muir and Robert Cheshire were killed and three other law enforcement officers were wounded. A jury convicted Mr. Faul of two counts of second-degree murder, four counts of assaulting U.S. Marshals and officers assisting them, one count of conspiring to assault, and one count of harboring a fugitive. *United States v. Faul*, 748 F.2d 1204, 1207–08 (8th Cir. 1984). The shootout happened when the U.S. Marshals tried to arrest Gordon Kahl—a tax protester and member of the extremist group Posse Comitatus—for violating the terms of the probationary sentence he was serving after being convicted of failing to file income taxes. *Id.* at 1208; *Id.* at 1227 (Lay, C.J., dissenting). Mr. Faul was traveling with Gordon Kahl, Mr. Kahl's son Yorie Kahl, and others when the group stopped at a roadblock set up by the U.S. Marshals. *Id.* at 1209. Mr. Faul and the younger Mr. Kahl got out of the car in which they were riding and pointed their mini-14 rifles at the officers. *Id.* No one fired. *Id.* A few minutes into the standoff, Mr. Faul ran towards a nearby mobile home, pursued by a Deputy U.S. Marshal. *Id.* Just before shooting started, the Deputy U.S. Marshal ordered Mr. Faul to throw down his weapon. *Id.* Instead

of complying, Mr. Faul ran to the corner of the mobile home and fired at least six shots. *Id.*; *Faul v. Wilson*, No. 15-CV-1541, 2016 WL 54195 at *3 (D. Minn. Jan. 5, 2016). After the last shots were fired, Mr. Faul rushed to the injured Yorie Kahl, aimed his own rifle at a fleeing deputy sheriff, then helped Yorie Kahl escape. *United States v. Faul*, 748 F.2d at 1209–10. Mr. Faul surrendered the next day. *Id.* Mr. Faul maintains he was an innocent bystander in what he calls the "deep tragedy of the Medina killings," and describes the Marshals' stop of him and his companions as an "ambush." (Pet. 2, Dkt. No. 1-1 in 23-CV-1337.)

The judge in his criminal case sentenced Mr. Faul to serve two life sentences concurrently for the murders. *Id.* The judge imposed four concurrent ten-year sentences for the assault, to be served consecutive to the life sentences. *Id.* For the conspiracy and harboring crimes, he added two concurrent five-year terms, to be served consecutive to both the life and ten-year terms, making the total length of Mr. Faul's sentence life plus 15 years. *Id.* He began serving this sentence on June 24, 1983. (Decl. of Scott Faul, Ex. M at 38, Dkt. No. 1-2 in 23-CV-1337.) The Eighth Circuit Court of Appeals affirmed his conviction, and the United States Supreme Court denied his petition for certiorari. *United States v. Faul*, 748 F.2d 1204, 1208 (8th Cir. 1984), *cert denied*, 472 U.S. 1027 (1985).

The cases before the Court are Mr. Faul's seventh and eighth habeas petitions. *See Faul v. Wilson*, No. 15-CV-1541 (PJS/TNL), 2015 WL 13746676 at *2–3, *aff'd*, 2016 WL 54195 at *1 (Jan. 5, 2016) (cataloguing the first five cases—*Faul I* through *Faul V*—in detail); *United States v. Faul (Faul VI)* 3:83-CR-16, 2021 WL 965311 at *3 (denying Mr.

3

Faul's request for a sentence reduction, construing some of his claims as habeas claims under 28 U.S.C. § 2255, and dismissing the action).

The cases currently before the Court are *Faul v. Lejeune* (*Faul VII*), 22-CV-2993 (MJD/JFD) and *Faul v. King* (*Faul VIII*), 23-CV-1337 (MJD/JFD). *Faul VII* is a petition for a writ of habeas corpus under § 2241 that challenges the calculation of Mr. Faul's sentence under 18 U.S.C. § 4206(d). (Pet. 1, 6, Dkt. No. 1.) *Faul VIII* is another § 2241 petition in which Mr. Faul challenges the U.S. Parole Commission's decision not to grant him parole, arguing that the decision violated his due process rights because it lacked a rational basis, punished him for exercising his First Amendment rights, and was based on an impermissibly vague statute. (Pet. 1, 6–8, Dkt. No. 1.) On September 5, 2023, Mr. Faul filed a motion for a temporary restraining order that would prohibit BOP from transferring him out of the District of Minnesota until these cases had resolved. (Dkt. No. 17 in 22-CV-2993; Dkt. No. 19 in 23-CV-1337.) Two days later, Mr. Faul filed a motion to appoint counsel in *Faul VIII*, but not *Faul VII*. (Dkt. No. 21 in 23-CV-1337.)

## II.  HABEAS CORPUS PETITIONS

In *Faul VII* Mr. Faul challenges how the Commission calculated his date of parole eligibility and in *Faul VIII* he challenges the constitutionality of the United States Parole Board's decision to deny him parole. The Court does not need to decide how to calculate Mr. Faul's parole eligibility date, because under both Mr. Faul's method and Respondent's method of calculating, Mr. Faul is entitled to parole consideration. However, that means only that Mr. Faul is entitled to be considered for parole, not that he is entitled, after that consideration, to be granted parole. The unanswered question—whether Mr. Faul is

4

entitled to parole—is the question raised by his constitutional challenge to the Parole Board's decision in *Faul VIII*. The Court finds that the decision to deny Mr. Faul parole at his most recent hearing was constitutional.

### A. *Faul VII* Explores the Competing Constructions of 18 U.S.C. § 4206(d).

Mr. Faul claims that he is entitled to immediate release from confinement because he has served 30 years of his life term, which he argues is all that the law requires. (Pet. 11–12, Dkt. No. 1 in 22-CV-2993.) The undersigned need not decide whether Mr. Faul's reading, or the competing reading adopted by several federal courts, is correct. This is because Mr. Faul has served enough time to be eligible for consideration of parole under either Mr. Faul's reading or the reading of those courts. But the statute also prohibits the U.S. Parole Commission from releasing a person when there is "a reasonable probability that he will commit any Federal, State, or local crime." The Commission found that Mr. Faul met this criterion—and Mr. Faul challenges that finding in *Faul VIII*—so any dispute about the portion of the statute that determines timing of Mr. Faul's eligibility for parole is beside the point and therefore moot.

### i.   *Applicable Law*

Mr. Faul is an "old law" prisoner—someone sentenced after the Parole Commission and Reorganization Act of 1976 established the modern parole system but before the Sentencing Reform Act of 1984 discarded that system in favor of sentencing guidelines. (Pet. 1.); *See Mistretta v. United States*, 488 U.S. 361, 363–67 (1989) (providing background on the Sentencing Reform Act). While the Sentencing Reform Act repealed

federal parole statutes as of the date of the Act's enactment, those statutes remained in force for prisoners who committed their crimes before November 1, 1987. *See* Pub. L. No. 98-473, § 235(b)(1)(A), 98 Stat. 1837, 2032 (1984); Pub. L. No. 117-328, § 801(b), 136 Stat 4459, 5232 (2022) (extending U.S. Parole Commission's existence until Nov. 1, 2023); *Edmundson v. Turner*, 954 F.2d 510, 512 n.2 (8th Cir. 1992); *Von Kahl v. Segal*, 19 F.4th 987, 988 (7th Cir. 2021); *Hackley v. Bledsoe*, 350 F. App'x 599, 601 (3d Cir. 2009). There are two potential routes to parole for old law prisoners who, like Mr. Faul, are sentenced to a life term. 18 U.S.C. § 4205; 18 U.S.C. § 4206(d); *Dufur v. U.S. Parole Comm'n*, 314 F. Supp. 3d 10, 12 (11th Cir. 2018). The first path is discretionary parole: once a prisoner has served ten years of their life sentence, they are eligible for parole. 18 U.S.C. § 4205. The Commission then uses its discretion to release, or continue holding, the eligible prisoner. *Id.* 18 U.S.C. § 4206(a) (listing criteria for the Commission to consider before granting parole); *Dufur*, 314 F. Supp. 3d at 12. The Commission may deny parole "notwithstanding the guidelines" set forth at 18 U.S.C. § 4206(a) if it determines there is "good cause" to do so and explains its decision in writing to the prisoner. 18 U.S.C. § 4206(c). The second path is called, somewhat misleadingly, "mandatory" parole. *Dufur*, 314 F. Supp. 3d at 12 ("This case presents the question whether mandatory parole in the federal prison system is mandatory. It is not.") The statute providing for "mandatory" parole reads as follows:

> Any prisoner, serving a sentence of five years or longer, who is not earlier released under this section or any other applicable provision of law, shall be released on parole after having served two-thirds of each consecutive term or terms, or after serving thirty years of each consecutive term or terms of more than forty-five years including any life term, whichever is earlier:

> *Provided, however,* That the Commission shall not release such prisoner if it determines that he has seriously or frequently violated institution rules and regulations or that there is a reasonable probability that he will commit any Federal, State, or local crime.

18 U.S.C. § 4206(d). The parties disagree about how this statute applies to Mr. Faul, specifically when Mr. Faul was eligible for "mandatory" parole.

### ii.    Analysis

The parties disagree as to whether Mr. Faul must serve thirty years or forty years before being eligible for parole consideration. As with any statutory interpretation dispute, the Court begins with the text of the statute itself. *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). The statute requires the Commission to parole a petitioner who has "served two-thirds of each consecutive term or terms," or who has served "thirty years of each consecutive term or terms of more than forty-five years including any life term, whichever is earlier." 18 U.S.C. § 4206(d). But the statute explicitly prohibits the Commission from releasing any prisoner who it "determines . . . has seriously or frequently violated institution rules and regulations" or if it finds "there is a reasonable probability" that the prisoner "will commit any Federal, State, or local crime." *Id.*

Mr. Faul claims that the text of the statute entitles him to release after he serves two thirds of each of his consecutive sentences or thirty years on his life sentences, whichever is earlier (Pet. 11.) He reasons that "two-thirds of a life sentence is still life," so the first prong of the disjunction would have him serve life in prison. (*Id.*) In contrast, the second prong of the disjunction only requires him to serve thirty years: if he has to serve "thirty years of each consecutive term in excess of forty-five years," and he is serving only one

term of imprisonment of over 45 years (the two murder sentences running concurrently), then he only needs to serve 30 years under the second prong. (*Id.* at 11–12.) Since 30 years is less than life in prison, Mr. Faul believes the second prong of the disjunction applies to this case and he concludes that because he has served well over 30 years in prison, he is entitled to immediate release. (*Id.* at 11.)

Respondent argues that the statute makes clear that a life term is treated like a 45-year term for the purposes of 18 U.S.C. § 4206. (Resp. 12, Dkt. No. 10.) In other words, Respondent does not read the statute to be a disjunction, but rather one rule: prisoners "shall be released on parole after having served two-thirds of each consecutive term or terms," with the phrase "each consecutive term or terms" modified by the caveat that "serving thirty years of each consecutive term or terms of more than forty-five years including any life term," is sufficiently long to become parole-eligible. *Shaw v. Young*, No. 5:16-CV-33 (RWS), 2018 WL 3081005, at *2 (E.D. Tex. June 22, 2018) (repeating the respondent's argument in that case). Respondent concludes that Mr. Faul was only eligible for mandatory parole after he served two thirds of his life term (30 out of 45 years), plus two thirds of his combined ten and five-year consecutive sentences (an additional ten years, since ten is two thirds of 15), or a total of 40 years. (Resp. 11.) Mr. Faul critiques this reading, arguing that it makes surplusage out of the "whichever is earlier" language. (Pet. 13.)

The weight of authority on this question favors Respondent's reading. *See, e.g.*, *Von Kahl v. Segal*, 19 F.4th 987, 989–90 (7th Cir. 2021); *Hackley v. Bledsoe*, 350 F. App'x 599, 602 (3d Cir. 2009); *Shaw v. Young*, No. 5:16-CV-33 (RWS), 2018 WL 3081005, at *3

(E.D. Tex. June 22, 2018). Most notably, the Seventh Circuit rejected Faul's reading in the case of his co-defendant, Yorie Kahl, who received the same sentence. *Von Kahl*, 19 F. 4th 987 ("This leads to the question whether the Bureau has read § 4206(d) correctly, and it has.") The *Kahl* court construed the statute as equating an indeterminate life term with a determinate 45-year term, but still requiring prisoners to serve "serve two-thirds or thirty years of 'each consecutive term or terms.'" *Id.* Because Yorie Kahl was serving three consecutive terms of imprisonment—life imprisonment, followed by a consecutive ten years, followed by a consecutive five years—it concluded Kahl would not be eligible for parole until he served 40 years. *Id.* To find otherwise would effectively erase Mr. Kahl's ten- and fifteen-year sentences when the statute itself "calls for the aggregation of limits 'under each consecutive term or terms,'" an outcome the Seventh Circuit found illogical. *Id.* Other courts share the Seventh Circuit's reading. *See, e.g.*, *Hackley*, 350 F. App'x 599, 601 (rejecting argument that petitioner was eligible for mandatory parole after 30 years and finding "he is only eligible for mandatory parole after serving two-thirds of each component of his federal sentence"); *Amaro v. Rios*, No. 1:11-CV-234 (SKO/HC), 2014 WL 467130, at *5 (E.D. Cal. Feb. 5, 2014); *Buffalo v. Ives*, No. EDCV 15-248-JLS (AJW), 2015 WL 13918229, at *3 (C.D. Cal. July 29, 2015), *R&R adopted*, No. EDCV 15-248 (JLS/AJW), 2015 WL 6181718 (C.D. Cal. Oct. 21, 2015), *aff'd sub nom. Buffalo v. Shinn*, No. 16-55358, 2017 WL 3974008 (9th Cir. Mar. 2, 2017).

For two reasons, the Court need not decide whether Petitioner or Respondent is reading the statute correctly. First, whether Mr. Faul must serve thirty years or forty years to be eligible to be considered for parole, as of February 2023 he had served forty years.

Second, even if the Court were to agree that Mr. Faul was eligible for parole consideration ten years ago, it still could not grant Mr. Faul the relief he seeks. The "mandatory parole statute" explicitly prohibits the Commission from releasing any prisoner if "there is a reasonable probability" that the prisoner "will commit any Federal, State, or local crime." 18 U.S.C. § 4206(d). Therefore, a prisoner who is eligible for "mandatory parole" is not entitled to receive parole but is only eligible to receive parole. For this reason, Mr. Faul is incorrect when he claims that he was "paroled" from his life sentence by operation of law in February 2013, automatically started serving his remaining sentences, and has served his entire sentence when his good time credits are counted.[1] (Pet. 13–14.) Reaching the time markers described in 18 U.S.C. § 4206(d) creates a presumption that parole will be granted, but the U.S. Parole Commission reserves the right to deny parole if certain conditions apply. *Dufur*, 314 F. Supp. 3d at 25 ("Here, the 'shall . . . unless' structure is clear, with the first half of the statute creating a presumption of release that can be overcome through the findings laid out in the second.")

The U.S. Parole Commission decided that Mr. Faul should not be released in part because he was likely to reoffend. (Faul Decl., Ex. J at 23, Dkt. No. 1-2.) Mr. Faul's remaining arguments[2] focus on this decision and whether it is legally sufficient to prohibit him from being paroled.

---

[1] Mr. Faul claims that Respondent did not address this argument in its briefing, and thus conceded the point. (Pet.'s Reply 3, Dkt. No. 14.) While Respondent did not directly address this point, the plain text of the statute effectively refutes it.

[2] Mr. Faul argues that the Parole Commission's decision is "legally insufficient to block" his "mandatory" parole for two reasons. First, he faults the Commission for determining

**B.  The U.S. Parole Commission's Decision Is Valid and Petitioner Is Not Entitled to Immediate Release in *Faul VIII*.**

Mr. Faul makes three challenges to the Commission's decision. First, he claims that the decision violates his Fifth Amendment right to due process because it has no rational basis. (Pet. 6, Dkt. No. 1 in 23-CV-1337.) Second, he argues that the statute itself, as well as the Commission's decision, violate his First Amendment right to free speech. (*Id.* at 6–7.) Third, he claims that the statutory provision that prevents the Commission from releasing prisoners when it finds "there is a reasonable probability" that they "will commit any Federal, State, or local crime" is so vague as to violate the Fifth Amendment's Due Process Clause. (*Id.* at 7.) The undersigned is unpersuaded by these arguments and recommends denying Mr. Faul's habeas petition. The Court will first review the process the United States Parole Commission uses to grant or deny parole. Then, it will recount Mr. Faul's journey through that process before addressing his three challenges to the Parole Commission's decision and explaining why they fail.

### i.  *Mr. Faul's History with the United States Parole Commission*

Prisoners sentenced to life imprisonment are first eligible for parole after they have served ten years of their sentence. 28 C.F.R. § 2.2(a); *see also* 18 U.S.C. § 4203(a)(1)

---

there was a "reasonable *likelihood*" that he would reoffend, when the statute requires a finding of a "reasonable *probability*" that he would reoffend. (Pet.'s Reply 5.) But this is a semantic distinction between two synonyms and the choice of one word or the other does not make a difference. Second, he criticizes the Commission's decision as inconsistent with his PATTERN assessments, which have consistently shown he is at "minimum" risk of recidivism. (*Id.* at 6–7.) Because this argument goes to whether the Commission's decision violated Mr. Faul's right to due process under the Fifth Amendment, it is addressed alongside Mr. Faul's other Due Process Clause arguments.

(delegating rulemaking power to the Commission). Nine months before a prisoner has served their ten years, an initial hearing is scheduled with a hearing examiner. 28 C.F.R. § 2.13(a); 28 C.F.R. § 2.23 (delegating authority to hearing examiners). A prisoner may be represented, as can any parties who oppose parole. 28 C.F.R. § 2.13(b). At the conclusion of the hearing the examiner makes a recommendation to the Commission on whether the prisoner should receive parole. 28 C.F.R. § 2.13(c). If the Commission accepts the recommendation, the prisoner receives parole. *See* 28 C.F.R. § 2.23–24 (outlining the structure of the review process). A prisoner dissatisfied with the Commission's decision may appeal to the National Appeals Board, a panel of three commissioners that may affirm the initial decision, modify or reverse the decision, or order a new hearing. 28 C.F.R. §§ 2.1(c), 2.26(a)–(b). Otherwise, the decision of the Commission becomes final. 28 C.F.R. § 2.26(a). In cases that are appealed, the decision of the National Appeals Board is the final decision of the Commission. 28 C.F.R. § 2.26(c).

The Commission will not grant parole unless it is satisfied that the prisoner (1) "has substantially observed the rules of the institution or institutions in which he has been confined," (2) that his parole would "not depreciate the seriousness of his offense or promote disrespect for the law," and (3) that there is "a reasonable probability" that the prisoner would "live and remain at liberty without violating the law or the conditions of his parole." 28 C.F.R. § 2.18; 18 U.S.C. § 4206(a). The Commission considers a broad range of information when deciding whether these criteria are satisfied. *See* 18 U.S.C. § 4207; 28 C.F.R. § 2.19 (listing the information the Commission "shall" consider). If the Commission does not grant parole, it will set a reconsideration hearing 15 years in the

future, unless the prisoner's "mandatory" parole date will occur before then, in which case the Commission will consider the prisoner for parole at that time. 28 C.F.R. §2.12(b). The reconsideration hearings include a "full reassessment of the case," just like an initial hearing. Prisoners sentenced to imprisonment for life receive interim reviews every two years following their initial hearing to "consider any significant developments" in their status since their last hearing. 28 C.F.R. § 2.14(a)(1)(ii); 28 C.F.R. § 2.55(b).

Mr. Faul had his initial parole hearing in December 2002. (Decl. of Bernard Desrosiers, Ex. 2, Dkt. No. 15-2.) The hearing summary indicates that he admitted his involvement in the February 13, 1983 shootout and admitted returning fire after the shooting started that day. (*Id.* at 1.) He said "it was not his intention on that day to shoot any law enforcement officers." (*Id.*) The hearing examiner acknowledged that Mr. Faul had adjusted well to prison life, done good work, and demonstrated "generally favorable conduct" in the first 19 years of his sentence. (*Id.* at 4.) He went on to say that Mr. Faul was less culpable than his co-defendants, but that Mr. Faul's firing of his weapon was "an extreme act" and that he would need to serve more time before the Commission could be satisfied that he was held accountable for his participation in the shootout. (*Id.* at 5.) Mr. Faul's appeal of this decision to the National Appeals Board was denied. (Desrosiers Decl. Ex. 4, Dkt. No. 15-4.)

Mr. Faul had his reconsideration hearing in April 2018. (Desrosiers Decl. Ex. 9 at 1.) According to the summary of that hearing, Mr. Faul said he acted in self defense on the day of the shootout, never intended to commit murder, and contested the legality of his convictions. (*Id.*) He attributed the event to the "atmosphere . . . created by President

13

Reagan and Attorney General Meese," who encouraged federal law enforcement agencies to be "more aggressive in apprehending criminals." (*Id.* at 2.) In an aside, the hearing examiner reported that in a recent "letter to the Commission, the subject referred to the U.S. Marshals as 'murderous thugs' whom he says 'attacked me that day without cause,' under the authority of 'Lucifer-worshiping' Ronald Reagan and 'his accomplice, Edwin Meese.'" (*Id.* at 2.) The Commission denied Mr. Faul parole because his offense was "highly aggravate[d]," he did not accept responsibility for his participation, he continued to challenge his convictions, and he had not participated in "any meaningful programming" to reduce his likelihood of recidivism or to change the behavior that led to his conviction. (Desrosiers Decl. Ex. 10 at 1.) The National Appeals Board denied Mr. Faul's appeal. (Desrosiers Decl. Ex. 11 at 1.)

In July 2021, Mr. Faul had an interim hearing at which he "forcefully stated" that the Commission's decisions were based on "false information," not facts. (Desrosiers Decl. Ex. 14 at 1, Dkt. No. 15-14.) He claimed that the Commission did not adequately weigh his culpability as a person who returned fire only after being fired upon. (*Id.*) The examiner advised that disputes about the facts of his case were best presented to a court of law, rather than the Commission, and explained what information the Commission would consider. (*Id.*) Mr. Faul replied that he already knew the Commission would deny him parole at his "mandatory" parole hearing in 2023 and said he wanted to waive the interim hearing because he did not have family support present. (*Id.* at 2.)

Mr. Faul did have a "mandatory" parole consideration hearing in January 2023. (Desrosiers Decl. Ex. 21 at 8, Dkt. No. 15-21.) Mr. Faul made a statement at the hearing,

14

saying he wanted to waive parole consideration because he should already have been released, and that he expected his lawsuit challenging his imprisonment would go all the way to the Supreme Court. (*Id.* at 9.) The hearing had been rescheduled twice (once in May 2022 when Faul refused to participate and once in September when Faul requested a continuance, which was granted) so the Commission decided to hold the hearing anyway. (*Id.* at 10; Resp. at 9–10, Dkt. No. 14 (outlining sequence of events).) An Assistant United States Attorney for the District of North Dakota testified in opposition to Mr. Faul's parole and drew the Commission's attention to a 2020 court filing where Mr. Faul refused to accept responsibility for his crime and called into question the legitimacy of the courts, the U.S. Parole Commission, and the United States Attorney's Office. (Desrosiers Decl. Ex. 21 at 8.) The Office was concerned that Mr. Faul would not abide by the terms of parole and would not acknowledge the authority of the United States Probation Office. (*Id.*) It invited the Commission to judge Mr. Faul's preparedness for parole based on his own words in the December 2020 filing.

This Court has reviewed that filing. In it, Mr. Faul writes:

- "When I am released, I am going to retire to my farm near Harvey, North Dakota, to continue exactly from the same point which I was at in 1983 before I was unlawfully attacked by murderous thugs of the Ronald Reagan, William French Smith, Edwin Meese squad of terrorists." Petition for Compassionate Release Pursuant to 18 U.S.C. § 3582 at 3–4, *Faul v. Bureau of Prisons*, No. 3:83-CR-16 (Dkt. No. 2) (D.N.D. Dec. 7, 2020).

15

- That the United States is a corporation, a "shameful creature" that "reeks of being a farce and a sham." *Id.* at 4, 6, and 7.

- That the United States Attorney's Office was "favor-accepting scum," and he had no respect for it. *Id.* at 5.

- That both the judge presiding over his 1983 trial and a judge who dismissed one of his § 2255 petitions were "sham judges" who committed felonies under the "favor-promising thrall of Lucifer" and that he had "less than" no respect for them. *Id.* at 3, 5. *See generally United States v. Faul,* No. 3:83-CR-16, 2007 WL 1847371, at *1 (D.N.D. June 25, 2007) (describing the judges' roles and Mr. Faul's allegations against them).

- Mr. Faul wrote that "I was supposed to have been released by operation of law in 2013. However, dregs in the Parole Commission and in the Records Department(s) of the BOP have unjustifiably and unlawfully extended my release date to 2023. When that date arrives, those biased scum will once again enlist some new lies, whatever they feel the whim to need, to deny release yet once again. They will do that because they are part of the deep state swamp, and have made promises of favoritism to their Lucifer-worshiping cohorts." Petition for Compassionate Release Pursuant to 18 U.S.C. § 3582 at 2, *Faul v. Bureau of Prisons*, No. 3:83-CR-16 (Dkt. No. 2) (D.N.D. Dec. 7, 2020).

- "The biased scum of the swamp sitting on the Commission simply proceed with a mindless parroting of the statute itself. They cannot help themselves—they

promised favoritism to their fellow swamp creatures. This is what scumbags do when their fellow craft beckon." *Id.* at 3.

Returning to the hearing in January 2023, the Commission heard from multiple victims opposed to Mr. Faul's release. (Desrosiers Decl. Ex. 21 at 9.) It learned that he had completed only 55 hours of programming during his almost 40 years of incarceration, having spent most of his time in the law library. (*Id.* at 10, 11.) His plan upon release was to "be a hobo" and go back to farming. (*Id.*) The examiner concluded that Mr. Faul's statements made it "clear he still holds the same beliefs he did when he committed his offenses" and while it was not a crime to have such beliefs, they led him to "participate in the murder of multiple federal law enforcement officers." (*Id.* at 8, 11.) The examiner noted with concern that Mr. Faul had not completed risk-related programming, had no remorse for the killings, and his feelings about the illegitimacy of government power suggested there was "no reason to believe he would abide by the limitations of his parole." (*Id.* at 11.) The decision of the Commission read as follows:

> After consideration of all factors and information presented, at this time, the Commission is denying your release under the standards at 18 U.S.C. § 4206(d) for the following reasons: The Commission has determined that there is a reasonable likelihood that you will commit any Federal, State or local crime. You were part of a violent anti-government group responsible for the murder and serious injury of several federal law enforcement officers. You continue to deny your crimes, claim yourself and your conspirators are the victims, and deny the legitimacy of the U.S. Government, law enforcement, and the judiciary. Your own words show that you would not obey the requirements of your release. You have not completed any programming to address your rehabilitation such as victim impact or criminal thinking and have shown no interest in completing such programming, further emphasizing that you see no issues with your history of violence and have no intention of improving your thoughts and behaviors.

(Desrosiers Decl. Ex. 22, Dkt. No. 15-22.) The National Appeals Board denied Mr.

Faul's appeal of the decision. (Desrosiers Decl. Ex. 23, Dkt. No. 15-23.)

### ii.    *Standard of Review of Commission Decisions*

Congress vested the power to grant or deny parole in the Commission, which is part

of the executive branch, and the courts have limited power to review the Commission's

decisions. *United States v. Addonizio*, 442 U.S. 178, 188, (1979); *Langella v. Anderson*,

612 F.3d 938, 940 (8th Cir. 2010); *Edwards v. United States*, 574 F.2d 937, 941 (8th Cir.

1978) (explaining that three branches of government share the responsibility of

determining when prisoners are released); 18 U.S.C. § 4202 (establishing the Commission

as "an independent agency in the Department of Justice"). Courts cannot review the

"ultimate substantive decisions granting or denying parole," but they can consider whether

the Commission "acted outside its statutory limits" or in violation of the Constitution in its

decision-making process. *Jones v. U.S. Bureau of Prisons*, 903 F.2d 1178, 1183–84 (8th

Cir. 1990) (holding same and distinguishing prior case law applying "arbitrary and

capricious" standard[3] as written without the benefit of a jurisdiction analysis); *Green v.

Castillo*, 807 F.3d 905, 908 (8th Cir. 2015). "A Parole Commission decision is substantive,

and hence unreviewable, if it involves the exercise of judgment among a range of possible

---

[3] At least one jurist believed the Eighth Circuit was wrong to discard the "arbitrary and capricious" standard because earlier panel opinions had implicitly considered the scope of jurisdiction in these cases and adopted "arbitrary and capricious" as the standard. *Green v. Castillo*, 807 F.3d 905, 907 n.3 (8th Cir. 2015) (citing *Edmundson v. Turner*, 954 F.2d 510, 514 (8th Cir. 1992) (Heaney, C.J., dissenting)). On his view, the Eighth Circuit was not at liberty to set aside its prior decisions and apply a new standard of review. *Id.* In any event, this Court finds nothing arbitrary and capricious in the Commission's decision in this case. *Id.*

choices or options." *Wajda v. United States*, 64 F.3d 385, 388 (8th Cir. 1995) (internal quotations and citations omitted). Courts will not consider the process the Commission uses to uncover evidence or how it weighs that evidence. *Langella*, 612 F.3d at 940. The only question courts need to ask is whether the decision was supported by a rational basis. *See, e.g.*, *Dufur v. U.S. Parole Comm'n*, 34 F.4th 1090, 1099 (D.C. Cir. 2022); *Gambino v. Morris*, 134 F.3d 156, 160 (3d Cir. 1998); *Walrath v. Getty*, 71 F.3d 679, 684 (7th Cir. 1995).

### iii.   The United States Parole Commission's Decision Did Not Violate Mr. Faul's Fifth Amendment Rights.

Mr. Faul alleges that the Commission violated the Due Process clause of the Fifth Amendment to the Constitution, which prevents the government from depriving people of their liberty without due process of law. U.S. Const. amend. V. Fifth Amendment liberty interests come from either the Constitution or a federal statute. *United States v. Johnson*, 703 F.3d 464, 469 (8th Cir. 2013). The Supreme Court has held that the Constitution does not provide a right to parole. *Greenholtz v. Neb. Penal Inmates*, 442 U.S. 1, 7 (1979). However, a federal statute can create a protected, if limited, liberty interest in parole. *Evans v. Dillahunty*, 662 F.2d 522, 524 (8th Cir.1981) ("[T]he more complete lesson of *Greenholtz* is that, though there is no inherent right to parole, a limited right to parole may be provided by applicable statutes.") In *Dillahunty*, the Eighth Circuit recognized that 18 U.S.C. § 4206(a) gave eligible prisoners an "expectancy of parole" warranting due process protections, because it used mandatory language and limited agency discretion, just as the

statute in *Greenholtz* did. *Id.*; *Solomon v. Elsea*, 676 F.2d 282, 285 (7th Cir. 1982). In

*Greenholtz*, the Supreme Court analyzed the following statute:

> Whenever the Board of Parole considers the release of a committed offender who is eligible for release on parole, it shall order his release unless it is of the opinion that his release should be deferred because: (a) There is a substantial risk that he will not conform to the conditions of parole; (b) His release would depreciate the seriousness of his crime or promote disrespect for law; (c) His release would have a substantially adverse effect on institutional discipline; or (d) His continued correctional treatment, medical care, or vocational or other training in the facility will substantially enhance his capacity to lead a law-abiding life when released at a later date.

442 U.S. at 11. The Court found that the language created a presumption that parole would

be granted so long as none of the four enumerated concerns were present. (*Id.*) That is the

same structure as 18 U.S.C. § 4206(d), which provides a presumption of release tempered

with possible obstacles. 18 U.S.C. § 4206(d) ("Any prisoner, serving a sentence of five

years or longer . . . shall be released on parole after . . . *Provided, however,* That the

Commission shall not release such prisoner if . . . ."). *See Shahid v. Crawford*, 599 F.2d

666, 671 (5th Cir. 1979) (acknowledging without deciding that § 4206(d)'s language could

create a protected liberty interest). Thus, as the Supreme Court did in *Greenholtz* and the

Eighth Circuit did in *Dillahunty*, this Court finds that Mr. Faul has adequately alleged a

protected liberty interest in parole and therefore the process by which a decision is made

whether to grant or deny him parole must conform to due process.

Mr. Faul argues that the Commission's decision to deny him parole violated his

right to due process because it had no rational basis. (Pet. 8.) He claims there is no reason

to expect a 70-year-old family man and former farmer to reoffend after 40 years of

incarceration. (*Id.*) He contrasts the Commission's recent decision citing his risk of

20

recidivism with the statements of his 2002 hearing examiner about his low likelihood of recidivism, his consistently minimal PATTERN[4] scores, and his case manager's opinion that nothing in his case file suggested a security risk. (*Id.* at 8–9.) In his view, the Commission's decision ignores that he is a model prisoner who has worked throughout his incarceration and completed all the programming assigned to him. (*Id.* at 9–10.) The fact that he maintains his innocence and has some anti-government views is irrelevant, in his opinion, because he promises to comply with the law regardless of his views, as he has done in prison. (*Id.*) For example, he argues that filing documents with this Court requesting relief demonstrates his respect for the federal courts. (Pet. 15.)

Respondent argues that the Commission's decision did have a rational basis—three of them, in fact—and urges the Court not to substitute its judgement in an area reserved for the discretion of the Commission. (*Id.*) The Commission first relied on the seriousness of the underlying criminal conduct, which resulted in multiple injuries and the deaths of two federal law enforcement officers. (Resp. 16.) Second, the Commission considered Mr. Faul's continued assertions that he was attacked by "murderous thugs" in February 1983, wrongfully convicted and imprisoned by "sham judges," and remains in prison because of the "biased scum" on the Commission. (*Id.* at 17.) Respondent argues that the Commission properly wondered whether Mr. Faul would submit to federal authority on parole given

---

[4] The PATTERN (Prisoner Assessment Tool Targeting Estimated Risks and Needs) is a recidivism prediction tool used by the BOP which categorizes offenders as being at minimum risk, low risk, medium risk, or high risk of recidivism. PATTERN Risk Assessment, Fed. Bureau of Prisons, https://www.bop.gov/inmates/fsa/pattern.jsp (last visited Nov. 2, 2023).

these beliefs. (*Id.*) Third, Mr. Faul failed to take part in programming that would address criminal thinking and behavior, suggesting to the Commission that he believed he did nothing wrong and was likely to offend again. (*Id.*)

After reviewing the record—with the limited standard of review in mind—the Court will not disturb the Commission's decision because it was supported by a rational basis. The Commission was allowed to consider the severity of Mr. Faul's action of firing on law enforcement officers in a shootout that killed or wounded several people. *See* 18 U.S.C. § 4206(a) (prohibiting release if it would "depreciate the seriousness of the offense"); *Green*, 807 F.3d at 907 (upholding Commission's decision that considered the violence of underlying offense); *Parker v. Corrothers*, 750 F.2d 653, 662 (8th Cir. 1984) (upholding state parole board decision and noting, "the Board may determine that the serious nature of the inmate's offense requires that a longer term be served before parole release.") The Commission was further required to consider whether Mr. Faul posed a risk of reoffending on parole and it was entitled to consider evidence about that risk, including his statements and minimal programming history. 18 U.S.C. § 4206(d); 18 U.S.C. § 4207; *Green v. Castillo*, 807 F.3d 905, 908 (8th Cir. 2015) (holding Commission could consider prisoner's "acceptance of responsibility"); *Coleman v. U.S. Parole Comm'n*, 726 F. App'x 909, 912 (3d Cir. 2018) (holding Commission could consider prisoner's "inability or unwillingness to accept the wrongfulness of his previous conduct"). It considered the evidence after a hearing where Mr. Faul was invited, but declined, to give his perspective. The Court cannot now reweigh the evidence simply because Mr. Faul believes that the Commission made a poor decision. It can only review whether the decision was irrational, or "so arbitrary and

capricious as to amount to a violation of due process." *Green*, 807 F.3d at 908; *Langella*, 612 F.3d at 941. For the reasons set forth above, it was not.

> ### iv.   Neither 18 U.S.C. § 4206 Nor The United States Parole Commission's Decision Violated Mr. Faul's First Amendment Rights.

Mr. Faul next argues that the Commission's decision (and the statute on which it was based) violates his First Amendment rights because it allows the Commission to lengthen his imprisonment for merely disliking the government. (Pet. 11.) The Commission, he believes, is denying him parole because he participated in protected First Amendment activities such as petitioning the government for a redress of grievances or expressing political views. (*Id.*; Reply at 11 ("[W]e do not force people to die in prison for criticizing the government."))

Respondent argues that the Commission may consider a person's own statements when evaluating the likelihood that they will reoffend on parole. (Resp. 19.) The Commission was, in its view, allowed to consider Mr. Faul's "efforts to cast himself as the true victim, coupled with the general disdain he showed for the law" in making the probability-of-reoffense determination under 18 U.S.C. § 4206(d). (*Id.*) Because the statute required the Commission to assess the likelihood that Mr. Faul would reoffend, Respondent says the Commission had to consider Mr. Faul's beliefs and whether they would lead him to future criminal conduct. (*Id.* at 21.) This use of Mr. Faul's speech was in service to the legitimate penal goal of reducing recidivism. (*Id.*) Respondent also suggests that using Mr. Faul's statements in this way did not violate Mr. Faul's rights for the additional reason that prisoners' First Amendment rights are more limited than those of non-prisoners because of

23

the need to achieve the security and penal goals of the prison system. (*Id.* at 20.) Mr. Faul retorts that his actions on February 13, 1983 were rooted in self-defense, not political ideology. (Reply 12, 13.) He claims that today, as in 1983, his views might be "distasteful to some, but they are purely peaceful." (*Id.* at 11.)[5]

18 U.S.C. § 4206(d) required the Commission to evaluate Mr. Faul's risk of recidivism, and it was rational for it to consider Mr. Faul's statements in deciding whether he would be successful on parole. Mr. Faul's stated disrespect for devil-worshipping "sham judges," his disdain for the United States government, and his conclusion that the U.S. Marshals who attempted to serve an arrest warrant on Gordon Kahl on February 13, 1984 were "murderous thugs" leads one to question if Mr. Faul would even accept the authority of the parole authorities. It was rational for the Commission to be concerned. *See Dunne v. Jusino*, No. 2:20-CV-04504 (MWF/JC), 2020 WL 8840320, at *7 (C.D. Cal. Dec. 23, 2020), *R&R adopted*, 2021 WL 1215838 (C.D. Cal. Mar. 29, 2021), *aff'd*, No. 21-55507, 2023 WL 2783259 (9th Cir. Apr. 5, 2023) ("Certainly, the Commission acted within reason

---

[5] Mr. Faul requests an evidentiary hearing "to the extent the Court reaches the government's assertions that [he] has (or has ever had ) violent anti-government beliefs" or that those beliefs had anything to do with the events of February 13, 1983. (Reply 20.) An evidentiary hearing would serve no purpose because this Court cannot supplement or re-weigh the evidence that was before the Commission. *See Langella*, 612 F.3d at 940. Even if the Court were to hold an evidentiary hearing on the factual dispute between the parties about whether Mr. Faul has violent anti-government beliefs, it could not force the Commission to accept its findings because Congress delegated the parole decision to the Commission, not the Courts. *Cf. Hawkins v. Outlaw*, No. 2:09-CV-00112 (BRW/JJ), 2011 WL 1519354, at *1 (E.D. Ark. Apr. 20, 2011), *aff'd*, 450 F. App'x 563 (8th Cir. 2012) ("In essence Petitioner is asking for relief that this court cannot give. . . . Even if an evidentiary hearing was held and it was determined that Petitioner's PSR was incorrect this court would not have the authority under § 2241 to reduce his sentence.")

in considering petitioner's associations and speech as they related to his . . . pattern of violent behavior which related to his associations and beliefs, and his likelihood of future violent behavior."); *Evans v. Norwood*, No. 104-CV-5640 (AWI/JMD/HC), 2008 WL 2384763, at *5 (E.D. Cal. June 9, 2008), *R&R adopted*, 2008 WL 3068866 (E.D. Cal. Aug. 4, 2008) ("The Commission's statements, when viewed in context, show that its decisions were based not on Petitioner's beliefs or associations, but rather on his violent actions which were relevant in determining whether his release would jeopardize the public welfare.")

The fact that what concerned the Commission was Mr. Faul's speech does not, by itself, turn his denial of parole into a constitutional violation. Mr. Faul is not in prison for his beliefs, but for second degree murder, assault on federal officers, conspiracy, and harboring a fugitive. Until he is released he retains those First Amendment rights "that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (noting that one such objective is protecting the public from offenders while they work to rehabilitate themselves). The Commission, acting as an arm of the corrections system, pursuant to statute, considered Mr. Faul's statements when assessing his likelihood of success on release. If the Commission was prohibited from considering Mr. Faul's own speech in its analysis, a legitimate penological goal of the Commission would be frustrated. Thus, to the extent that Mr. Faul argues he has a First Amendment right to speak and not have that speech be considered by the Parole Commission, he is wrong.

### v.   18 U.S.C. § 4206(d)'s Recidivism Clause Is Not Void for Vagueness.

Mr. Faul's final argument is that the clause of 18 U.S.C. § 4206(d) that prohibits the Parole Commission from releasing a prisoner when it is reasonably probable that they will commit a crime is void for vagueness. The text, again, reads: "[t]he Commission shall not release such prisoner if it determines that . . . there is a reasonable probability that he will commit any Federal, State, or local crime." 18 U.S.C. § 4206(d). Mr. Faul claims this passage does not provide prisoners fair notice of the behaviors they must do (or refrain from doing) to avoid a finding that they are likely to reoffend, so it is void on its face. (Pet. 12.) Respondent counters that the void for vagueness doctrine does not even apply to 18 U.S.C. § 4206(d) because it is not a criminal statute that prohibits conduct, but a statute that provides—and limits—the power of the Parole Commission to release prisoners. (Resp. 22.) Respondent encourages the Court not to reward Mr. Faul's "attempts to shoehorn a doctrine primarily directed at criminal statutes [in]to a parole release statute." (*Id.* at 24.)

"A statute is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 958 (8th Cir. 2019) (internal quotations omitted) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). The void for vagueness doctrine applies mostly—but not exclusively—to criminal statutes because the penalties in those cases are severe and courts do not wish to punish people criminally when they were not

26

given adequate notice of what the law prohibited in the first place. *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019); *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,* 455 U.S. 489, 498–99 (1982) ("The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."); *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 575, (1973) (applying doctrine to a non-criminal statute). Respondent is correct in saying that a statute delegating power to an executive agency and imposing limits on its use does not generate the same concerns as a statute prohibiting criminal conduct and affixing penalties, but the context of this particular statute is criminal in the sense that it relates to the duration of sentencing for criminal behavior. If Mr. Faul fails in his challenge to the statute, he will remain in prison until the Parole Commission sees fit to release him or a court orders it to do so. Because Mr. Faul's continued detention is at stake, the Court finds that the void for vagueness doctrine is applicable here. *Cf. Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018) (applying the doctrine in construing a criminal statute referenced in statute regarding immigration hearings).

Courts analyze vagueness challenges as applied to a particular case, unless the statute implicates First Amendment rights, in which case they analyze the statute on its face and as applied to the challenger. *United States v. Flynn*, 969 F.3d 873, 881 (8th Cir. 2020); *Nooner v. Norris*, 402 F.3d 801, 807 (8th Cir. 2005). Because Mr. Faul has alleged a violation of his First Amendment rights, the Court will evaluate whether the statute is unconstitutionally vague both facially and as applied.

### a. *Facial Challenge*

Mr. Faul argues that 18 U.S.C. § 4206(d) allows the Parole Commission unfettered discretion to arbitrarily hold inmates without giving them clear notice of what behavior would prove to the Commission that the inmates were ready for release.[6] (Pet. 12.) Respondent argues that the statute is clear because "scores of federal district courts and multiple United States Courts of Appeals" have applied it without questioning its clarity or workability. (Resp. 25.) It also points out that courts are expected to apply interpretations of statutes that support, rather than undermine, their constitutionality. (*Id.*)

The prohibition on releasing a prisoner if the Commission "determines that . . . there is a reasonable probability that he will commit any Federal, State, or local crime" is not void for vagueness on its face. 18 U.S.C. § 4206(d). Mr. Faul does not point the Court to a dispute amongst the courts as to how to interpret this statute or the statute that outlines the factors the Commission should consider in making the determination. *See Johnson v. United States*, 576 U.S. 591, 601 (noting there was "pervasive disagreement" in the courts "about the nature of the inquiry" under the challenged statute and "the kinds of factors one is supposed to consider). The fact that a law is broad does not necessarily mean that it is "ambiguous, much less unconstitutionally vague." *Calzone v. Summers*, 942 F.3d 415, 426 (8th Cir. 2019). The plain text of this law does not prohibit any prisoner's conduct, but

---

[6] In his facial challenge, Mr. Faul compares the language at issue with an old parole statute in the state of New York, which was eventually amended. *Cicero v. Olgiati*, 410 F. Supp. 1080, 1093 (S.D.N.Y. 1976). But *Cicero* is inapposite because it did not find that the statute at issue was impermissibly vague; it denied a motion to dismiss the void for vagueness challenge on the limited record before the court at the time. *Id.* at 1094–95.

requires the Parole Commission to evaluate whether a prisoner is reasonably likely to commit a crime. 18 U.S.C. § 4206. The Commission will consider facility reports, presentence reports, criminal records, recommendations from the sentencing judge, victim statements, health examinations, and other criteria it finds relevant. 18 U.S.C. § 4207. The statute gives prisoners notice that any indication they are likely to commit a crime in the future might be used against them in the Commission's proceedings.

### b.   *"As Applied" Challenge*

As it relates to his case, Mr. Faul argues that nothing in the statute put him on notice that he had to have a certain view of the government or a certain number of programming hours above those which he was assigned to avoid the Commission finding him a risk of recidivism, despite his consistently minimal PATTERN score. (*Id.*) Further, he argues that the text provides no standard by which to measure a prisoner's probability of re-offense, so it is "purely arbitrary" and thus void on its face. (*Id.*) In his case, Faul claims the flexibility of the text allowed the Commission to deny him "mandatory" parole using recidivism risk as a pretext for their real reason for keeping him in prison: the fact that he was present when the tragedy occurred. (*Id.* at 13.)

Respondent argues that the Commission's application of the statute to Faul's case did not result in discriminatory enforcement but was a reasoned exercise of its discretion after considering the specific factors enumerated in 18 U.S.C. § 4207. (Resp. 14.) In Respondent's view, the fact that Congress told the Commission which factors to consider in making a parole determination shows that the statute is the very opposite of standardless or inviting arbitrary enforcement. (*Id.* 14–15.)

Faul replies that if the statute allows him to be lumped into the same group of people as the petitioners in *Dufur* and *Green*, the statute is so broad as to be meaningless. (*Id.* 15–16.) He distinguishes himself from the petitioner in *Dufur* by noting that he never tried to escape prison and never killed anyone in prison; he also distinguishes himself from the petitioner in *Greene* who had an "extensive history of assaulting women with knives." (*Id.* at 16.) In Mr. Faul's view, these petitioners were much more likely than him to reoffend, but the law unjustly treated them the same, so the law must be invalid. (*Id.*)

The Court accepts that Mr. Faul has not attempted a prison escape or demonstrated an "extensive" history of assaulting others. But Mr. Faul is like Mr. Dufur in that they both assaulted and killed law enforcement officers, an especially serious crime. *Dufur,* 34 F.4th at 1093, 1100. He is like Mr. Green in that he has not taken responsibility for his role in the murders for which he is serving his life sentence. *Green*, 807 F.3d at 907–08. As explained above, the Commission was entitled to consider the underlying facts of Mr. Faul's case and his view of what happened on February 13, 1983. 18 U.S.C. § 4207 (requiring the Commission to consider presentence investigation reports and information submitted by the prisoner, if relevant.) While Mr. Faul may not see himself as similar to Messrs. Dufur and Green, the Parole Commission saw similarities in their cases that bore on their likelihood to reoffend in the community, as the statute empowered it to do. While the statute is broad in its delegation of discretion to the Commission, it is not unbounded, and is valid both facially and as applied to Mr. Faul.

### III.  MOTION FOR TEMPORARY RESTRAINING ORDER

On September 1, 2023, Mr. Faul learned that he was going to be transferred to another prison outside of this District because he recently turned 70. (Emergency Mot. 2–3, Dkt. No. 17 in 22-CV-2993 (MJD/JFD); Dkt. No. 19 in 23-CV-1337 (MJD/JFD).) Mr. Faul filed an Emergency Motion to Prevent Transfer Pending Ruling on 28 U.S.C. § 2241, which the Court received on September 5. (Emergency Mot. 1–2.) He asked the Court to prevent his transfer to another prison, which he believed was scheduled to take place on the morning of September 6. (*Id.* at 2.) Mr. Faul argued that a transfer in his case would threaten this Court's jurisdiction over his petitions, because the proper respondent in a habeas case is the person who has physical custody of the petitioner. (*Id.* at 3.) Even if this Court retained jurisdiction over his case, Mr. Faul argued that the transfer would cause delays, would make any evidentiary hearing required more costly, and would separate him from his legal materials for possibly months. (*Id.* at 3.) The Court denied Mr. Faul's request for expedited review and ordered briefing on the motion. (Dkt. No. 20.) Respondent opposed the motion for a temporary restraining order because BOP's placement decisions are not reviewable by the Courts. (Resp. Opp'n Emergency Mot. 2–3, Dkt. No. 23 (quoting 18 U.S.C. § 3621(b)).)

Mr. Faul was transferred on September 6 to a federal transfer center in Oklahoma City (Resp. Opp'n 1), then to a federal corrections institution in Milan, Michigan where he now lives (Dkt. No. 24). Because the transfer has already occurred, the undersigned recommends that the motion for a temporary restraining order barring transfer be denied as moot. Even if the transfer had not taken place, the Court could still not order the relief

requested; the BOPs placement decisions are unreviewable. 18 U.S.C. § 3621(b) (BOP's "designation of a place of imprisonment . . . is not reviewable by any court."); *United States v. Vang*, No. 16-CR-277 (DWF/KMM), 2020 WL 4704875, at *2 (D. Minn. Aug. 13, 2020) ("Courts have consistently held that placement questions are not reviewable.").

Mr. Faul's motion does raise the question of whether this Court retains jurisdiction over the case now that Mr. Faul is no longer being held in the District of Minnesota. There has been some disagreement on this question in our District. *Compare Vaughn v. Marques*, No. 18-CV-1266 (JRT/HB), 2019 WL 2492777, at *3–4 (D. Minn. May 15, 2019), *R&R adopted*, 2019 WL 2491959 (D. Minn. June 14, 2019) (holding transfer did not deprive the Court of jurisdiction when briefing was complete at the time BOP transferred the prisoner and the Respondent did not challenge jurisdiction) *and Eubanks v. Wilson,* No. 15-CV-2677 (PJS/DTS), 2017 WL 2303506, at *2 (D. Minn. May 1, 2017), *R&R adopted*, 2017 WL 2303963 (D. Minn. May 25, 2017) (finding jurisdiction remained after transfer and even if it did not, Respondent had waived the issue) *with Ybarra v. Kallis,* No. 21-CV-1396 (DSD/TNL), 2022 WL 14615503, at *3 (D. Minn. Sept. 28, 2022), *R&R adopted*, 2022 WL 14615502 (D. Minn. Oct. 25, 2022) (finding transfer deprived the court of jurisdiction because it could not order a warden in another district to release the petitioner if he was successful).

The undersigned is satisfied that the Court retained jurisdiction even after Mr. Faul's transfer. *Weeks v. Wyrick*, 638 F.2d 690, 692 (8th Cir. 1981) ("Once the custodian is properly served, subsequent transfer of the petitioner does not cause a loss of habeas corpus jurisdiction in the original district."); *Simon v. Cruz*, No. 08-CV-4804 (MJD/JJ), 2009 WL

1507548, at *1 (D. Minn. May 29, 2009) (Davis, J.), *aff'd*, 371 F. App'x 709 (8th Cir.

2010) ("Although Petitioner is no longer incarcerated in the District of Minnesota, his

current habeas corpus petition can still be properly adjudicated here because he was

confined in this District when the petition was filed."); *Elkins v. Holinka,* No. 06-CV-0335

(PJS/FLN), 2007 WL 270117, at *1 (D. Minn. Jan. 26, 2007) (Schiltz, J.) (reaching the

same conclusion). Mr. Faul correctly filed his habeas petitions in this District while he was

confined here, properly named the wardens who had custody of him as subjects of the suit,

fully briefed his petitions, but was then transferred to another BOP facility through no fault

of his own. These facts are identical to those in *Vaughn v. Marques*, where the court

concluded it retained jurisdiction, noting that the bulk of case law, and the equities, favored

this outcome. 2019 WL 2492777, at *3–4. The Court reaches the same result in this case.

Further, Respondent has not moved to challenge the Court's jurisdiction, despite Mr. Faul

specifically raising the issue, so they could be considered to have waived this issue. *Id.* at

*4; *Redding*, 2018 WL 850147, at *5; *see also* Brian R. Means, *Federal Habeas Manual*

§ 1.100 (2023). For this reason, the undersigned addressed the merits of the underlying

petitions.

## IV.   MOTION TO APPOINT COUNSEL

The final motion to address is Mr. Faul's motion to appoint counsel. On September

7, one day after Mr. Faul believed he would be transferred to another prison—and after his

two petitions were fully briefed—the Court received a motion to appoint counsel for him

in *Faul VIII*, his later-filed habeas case. (Pet.'s Mot. Appoint Counsel, Dkt. No. 21.) He

seeks counsel because he considers the "old law" issues in the case complex but cannot

afford to hire a lawyer with the requisite experience to handle them. (*Id.* at 1.) Mr. Faul argued that counsel would help complete the record in this case by interviewing corrections officers at FCI Sandstone who want to support his application for parole, but can only do so if they are interviewed by counsel for a prisoner. (*Id.* at 2.) Counsel would also assist Mr. Faul during his transfer, when he would lose access to his legal materials. (*Id.* at 2.) The Respondent took no position on the motion.

The Sixth Amendment right to counsel does not extend to habeas proceedings, which are civil in nature. *McCall v. Benson*, 114 F.3d 754, 756 (8th Cir. 1997); *Hoggard v. Purkett*, 29 F.3d 469, 471 (8th Cir. 1994). However, courts may appoint[7] counsel for habeas petitioners when the interests of justice require it, such as when the court orders an evidentiary hearing. *Hoggard*, 29 F.3d at 471. In other cases, whether to appoint counsel in a case is at the discretion of the district court. *Id.* In exercising that discretion, courts will consider "the factual and legal complexity of the case, and the petitioner's ability both to investigate and to articulate his claims without court appointed counsel." *McCall v. Benson*, 114 F.3d 754, 756 (8th Cir. 1997). Appointments are rarely granted. *Kidd v. Fikes*, No. 20-CV-287 (SRN/TNL), 2020 WL 7166239, at *2 (D. Minn. Dec. 7, 2020).

---

[7] "Appoint" counsel is not exactly the correct term. More accurately, 28 U.S.C. § 1915(e)(1) allows courts to *request* that counsel represent a pro se litigant and 18 U.S.C. § 3006A(a)(2)(b) *permits* the Court to provide counsel to an indigent habeas petitioner when "the interests of justice so require." But "no statute permits the Court here to appoint counsel—that is, to require an attorney to represent Petitioner under the coercive threat of sanctions." *Anderson v. Janssen*, No. 17-CV-4480 (WMW/FLN), 2018 WL 10638660, at *1–2 (D. Minn. Apr. 23, 2018).

Because the undersigned recommends denying these petitions on the merits, Mr. Faul's request for counsel is moot. Even if it were not, the undersigned would not appoint counsel. Mr. Faul made his request after briefing was concluded and the Court sees no need for an evidentiary hearing to rule on the merits, both because the issues presented by this habeas case are fairly straightforward and also because, as noted above, this Court cannot re-weigh the evidence presented to the Commission. Thus, it is unclear what help counsel could be to Mr. Faul, who in any event has proven himself to be an articulate and sophisticated pro se litigant. The motion to appoint counsel is denied.

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Mr. Faul's Petition for Habeas Corpus (Dkt. No. 1 in 22-CV-2993 (MJD/JFD)) be **DENIED**.

2. Mr. Faul's Petition for Habeas Corpus (Dkt. No. 1 in 23-CV-1337 (MJD/JFD)) be **DENIED**.

3. Mr. Faul's Motions for a Temporary Restraining Order (Dkt. No. 17 in 22-CV-2993 (MJD/JFD); Dkt. No. 19 in 23-CV-1337 (MJD/JFD)) be **DENIED**.

   Further, it is **HEREBY ORDERED** that:

4. Mr. Faul's Motion to Appoint Counsel (Dkt. No. 21 in 22-CV-2993 (MJD/JFD)) is **DENIED**.

Date: March 25, 2024          *s/ John F. Docherty*
                              JOHN F. DOCHERTY
                              United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.

A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).